IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| MARY JANE FOSTER, | CASE NO. 3:20-CV-01857-JGC |
| Plaintiff, | JUDGE JAMES G. CARR |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

### INTRODUCTION

Plaintiff Mary Jane Foster filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision denying supplemental security income ("SSI"). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Rule 72.2, this matter was referred to a Magistrate Judge on August 20, 2020 for preparation of a report and recommendation, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 25, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Ms. Foster filed for SSI on March 20, 2018, alleging a disability onset date of July 16, 2013. (Tr. 178). Her claims were denied initially and on reconsideration. (Tr. 63-78, 80-95). She then requested a hearing before an administrative law judge. (Tr. 116-18). Ms. Foster (represented by

counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on May 1, 2019. (Tr. 34-62). On May 21, 2019, the ALJ issued a written decision finding Ms. Foster was not disabled. (Tr. 14-33). The Appeals Council denied Ms. Foster's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R. §§ 416.1455, 416.1481). Ms. Foster timely filed this action on August 20, 2020. (ECF #1).

FACTUAL BACKGROUND

## I.  ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Foster and VE Brian Womer, presented during the hearing before the ALJ.

Ms. Foster does not have a driver's license. (Tr. 39). She stopped driving after her license was suspended in 2000. (*Id.*). Ms. Foster does not currently drive because she is afraid of having a panic attack while driving. (*Id.*).

Ms. Foster testified that her back issues, anxiety, and depression keep her from working full time. (*Id.*). She cannot stand, sit, or walk for long periods of time. (*Id.*). Ms. Foster estimates she can walk the length of a football field before she feels "tremendous pain," can stand for ten minutes at a time, and can sit for about a half hour at a time before she begins twisting and turning from discomfort. (Tr. 40-41). Bending at the waist causes back pain. (Tr. 40). Squatting is also difficult because Ms. Foster has a hard time standing upright without assistance or using her cane. (Tr. 41). Ms. Foster believes she can lift about ten pounds. (*Id.*). Ms. Foster also testified her hands shake. (*Id.*). This interferes with her ability to pick up a glass or cup, hold a pencil, and write. (Tr. 49).

After Ms. Foster's low back surgery, she used a walker and then a cane during recovery. (Tr. 42). She now uses her cane when she is going to be walking or standing for long periods. (Tr. 43). Sometimes, she does not take her cane with her when she knows she is going to sit down for five or ten minutes and then leave, such as with her doctor's appointments. (*Id.*).

Ms. Foster has depression going back to her teenaged years. (Tr. 51). She sees Dr. Kelly Sprout once every three months and meets with a therapist about every two weeks. (*Id.*). Ms. Foster experiences difficulty with concentration and said it was hard to answer counsel's questions at the hearing. (Tr. 52). She related needing to rewind television programs to keep up with the plot. (*Id.*). Ms. Foster also has difficulty concentrating on conversation. (*Id.*).

Ms. Foster has panic attacks. (Tr. 53). Ms. Foster experienced these attacks every day until she was prescribed clonazepam three times a day. (*Id.*). With the medication, Ms. Foster has a panic attack once every week or two. (*Id.*). These attacks occur when she is alone in her room. (*Id.*). She begins to pace back and forth, breathe heavily, and loses control of her ability to unclench her fingers. (*Id.*). As a result, Ms. Foster gets so worked up she cannot think straight. (*Id.*). Ms. Foster does not tolerate stress or change well. (Tr. 54).

Ms. Foster has asthma, but it does not limit or restrict her on a daily basis. (Tr. 48). She sometimes experiences shortness of breath when in a hurry or going up and down stairs quickly. (*Id.*). Ms. Foster has nausea every day and vomits "sometimes every day, every other day, every two or three days." (Tr. 49). Mr. Foster testified about recent issues with blacking out, which has occurred at least ten times and her doctors are unable to understand why. (Tr. 43). Ms. Foster endorses falling often, up to twice a week if she leaves her house every day. (Tr. 43-44).

3

Ms. Foster gets about three to four hours of sleep each night. (Tr. 42). She explained that, due to back pain, she is unable to get comfortable, so she tosses and turns. (Tr. 50). Once she is able to get to sleep, Ms. Foster finds it difficult to stay asleep. (*Id.*). She never feels rested when waking the next day and naps for a couple of hours about once a week. (*Id.*). Upon waking, Ms. Foster feels horrible and "hurts all over really bad." (*Id.*). She endorses having no energy. (Tr. 51).

Ms. Foster lives with her boyfriend. (Tr. 44). She is able to do some household chores and receives help from her boyfriend with others. (Tr. 45). Ms. Foster can do some light dusting, can cook small frozen meals, and is able to do dishes, though she takes a break every five or ten minutes. (*Id.*). Ms. Foster cannot vacuum. (*Id.*).

Some days, Ms. Foster is unable to get out of bed without assistance. (Tr. 46). She does not socialize with others, even with her live-in boyfriend, and stays in her room by herself most of the time. (*Id.*). Ms. Foster testified to only leaving the house to attend medical appointments, but corrected herself when the ALJ reminded Ms. Foster she previously testified to running errands and going grocery shopping with her boyfriend. (Tr. 46-47). Ms. Foster clarified that when she goes shopping with her boyfriend, she takes her cane with her and he picks the groceries. (Tr. 47).

The VE then testified. The ALJ posed the following hypothetical individual and asked the VE if such an individual could perform any work in the national economy: an individual of Ms. Foster's age, education, and work experience who can work at the light exertional level but with additional limitations, including no climbing ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally stoop, kneel, crouch, and crawl; can occasionally use bilateral lower extremities for operation of foot controls; can occasionally use bilateral upper extremities for overhead reaching; can frequently use bilateral upper extremities for other reaching, handling, and

4

fingering; must avoid all exposure to hazards such as dangerous moving machinery and unprotected heights; avoid concentrated exposure to irritants, such as fumes, odors, dust, gases, extreme cold, extreme heat, and humidity; limited to simple, routine, and repetitive tasks in a work environment free from fast-paced production requirements, such as moving assembly lines and conveyor belt; involving only work-related decisions with few, if any, workplace changes; and can occasionally interact with the general public, coworkers, and supervisors. (Tr. 55-56). The VE testified the hypothetical individual could perform as an inspector and hand packager, a mail sorter, and a laundry folder. (Tr. 56). The VE noted all identified positions are unskilled, light, Specific Vocational Preparation ("SVP") 2. (*Id.*).

The hypothetical individual would still be able to perform the identified positions if subject to the same restrictions but with a sit/stand option, under which the hypothetical individual would be allowed to alternate sitting and standing positions for one to two minutes every thirty minutes. (Tr. 56-57).

If the hypothetical individual were limited to the sedentary exertional level under the same restrictions, including the sit/stand option, the individual would be able to perform work as a polishing machine operator, a sorting machine operator, and a wire insulator. (Tr. 57). There would be no work available in the national economy for a hypothetical individual who would be consistently off task for more than 10% of the workday, because an employer tolerates no more than 10% off-task. (*Id.*).

Counsel for Ms. Foster cross-examined the VE. The VE testified that use of a cane for ambulation would not rule out the previously identified positions, but use of a cane for standing would. (Tr. 59). When asked if a "limitation to simple, routine, repetitive tasks would preclude the

ability to carry out detailed written and oral instructions," the VE stated that it could, but noted there is a difference between tasks and instructions. (Tr. 59-60). Ms. Foster's counsel confirmed the Dictionary of Occupational Titles ("DOT") definitions of SVP and reasoning levels and confirmed that all occupations in the DOT have an SVP and reasoning level requirement. (Tr. 60).

## II.    PERSONAL AND VOCATIONAL EVIDENCE

Ms. Foster was 50 years old at the time of the administrative hearing. (Tr. 38). Ms. Foster completed tenth grade. (Tr. 39). Ms. Foster was employed as a frozen food packager in 2011. (Tr. 44).

## III.    RELEVANT MEDICAL EVIDENCE

Ms. Foster has chronic pain related to previous spine surgeries, including a cervical fusion at C3-C4, placement of Harrington rods for scoliosis, and a laminectomy at L5-S1. (Tr. 647). In January 2018, Ms. Foster attended an appointment with a pain management clinic for a medication review. (*Id.*). Ms. Foster reported cervical pain, numbness, and tingling that extends into her bilateral upper extremities and low back pain, numbness, and tingling that extends into her bilateral lower extremities. (*Id.*). She denied adverse effects from tramadol and gabapentin. (*Id.*). Ms. Foster also complained of headaches. (*Id.*).

On physical examination Ms. Foster displayed restricted range of motion in her neck, tenderness over the bilateral cervical facet joints, and trigger point tenderness. (Tr. 649). She had full range of motion and full strength in her extremities but appeared to have diminished sensation to light touch. (*Id.*). Ms. Foster displayed tenderness in her lumbar facet joints and increased pain with facet loading, but her seated straight leg raise ("SLR") test was negative. (*Id.*).

She received a referral to a neurologist to address the headaches, numbness, and tingling and instructions to return after the referral appointment. (Tr. 647).

In March 2018, Ms. Foster saw Gohar Ghazarian, M.D., to discuss her complaints of allergies, asthma, and nausea. (Tr. 298-302). Ms. Foster denied experiencing depression or anxiety at this visit, and she had normal mood, affect, behavior, orientation, and judgment. (Tr. 300). She displayed normal range of motion. (*Id.*).

Ms. Foster returned to the pain management clinic on May 1, 2018. (Tr. 652). She was unable to meet with the neurologist due to transportation issues, but claimed the numbness and tingling was much better and not bothering her as much. (*Id.*). On physical examination, Ms. Foster displayed restricted cervical range of motion and tenderness over the cervical and lumbar facet joints, full range of motion and strength in her bilateral extremities, intact sensation, and a negative SLR test. (Tr. 654). Ms. Foster reported doing well with the medications. (Tr. 652). At her appointment in July 2018, Ms. Foster's neurological examination was normal, and she had full range of motion in her lower extremities and a negative seated SLR test, but was tender to palpation in the lumbar facet joints and had increased pain with facet loading. (Tr. 1090).

At appointments with Dr. Ghazarian between July 2018 and February 2019, Ms. Foster continued to show normal mood, affect, behavior, orientation, and judgment; she also had normal range of motion and sensation. (Tr. 670-71, 694-95). During a November 2018 appointment, Ms. Foster reported thinking she had a seizure two months earlier, but Dr. Ghazarian characterized the event as a tremor of unknown origin; he doubted that it was a "true" seizure because during the event Ms. Foster did not lose consciousness. (Tr. 679, 684).

In December 2018, Ms. Foster was reevaluated at the pain management clinic. (Tr. 1096). She endorsed that gabapentin, baclofen, and tramadol were helpful and she tolerated them without adverse effects. (*Id.*). On physical examination, Ms. Foster had full range of motion, intact sensation, and equal motor strength in her extremities. (Tr. 1098). She displayed some tenderness in cervical, thoracic, and lumbar musculature; increased pain with facet loading; and a negative SLR test. (*Id.*). She returned in March 2019, where she had a normal neurological examination and physical examination revealed restricted cervical range of motion, the same lumbar symptoms identified at the previous appointment, except that the seated SLR test increased left lower extremity pain. (Tr. 1109).

In addition to medical treatment, Ms. Foster pursued mental health treatment at Firelands Regional Medical Center. She began treatment in April 2015, but treatment notes are available between May 2017 and October 2018. (Tr. 1032-1072). At her appointment with Kelly Sprout, M.D., in May 2017, Ms. Foster endorsed memory issues, low appetite and energy, and racing thoughts. (Tr. 1033). Ms. Foster denied medication side effects but reported being out of two medications, Pristiq and Abilify, and never taking the prescribed trazadone. (*Id.*). Dr. Sprout diagnosed major depression, panic disorder without agoraphobia, and obsessive-compulsive disorder. (*Id.*). Ms. Foster's diagnoses remained the same through October 16, 2018, the last available treatment note. (Tr. 1072). At her appointments, Ms. Foster was appropriately responsive and psychiatric examination was consistently normal, though she was occasionally irritable or anxious and complained of low energy. (Tr. 1033, 1038, 1045, 1048, 1057, 1068, 1072).

IV.    MEDICAL OPINIONS

State agency medical consultants reviewed Ms. Foster's record at the initial and reconsideration levels. On initial review, the medical consultant determined Ms. Foster could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand and/or walk for six hours in an eight-hour workday, and sit (with normal breaks) for six hours in an eight-hour workday. (Tr. 72). The medical consultant determined Ms. Foster had postural limitations, including restrictions to occasionally climbing ramps and stairs; never climbing ropes, ladders, or scaffolds; frequently balancing, kneeling, and crouching; and occasionally stooping and crawling. (Tr. 72-73). As to manipulative limitations, the medical consultant determined Ms. Foster was limited to occasionally reaching overhead, bilaterally. (Tr. 73). The medical consultant also opined Ms. Foster should avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, and poor ventilation. (Tr. 73-74). Finally, the medical consultant determined Ms. Foster should avoid all exposure to hazards such as dangerous machinery and unprotected heights. (Tr. 74).

Another medical consultant performed a mental residual functional capacity ("RFC") assessment and determined Ms. Foster did not have limitations in her ability to understand and remember. (Tr. 74). As to sustained concentration and persistence, Ms. Foster had moderate limitations in her abilities to maintain attention and concentration for extended periods, work in coordination with others without being distracted by them, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 74-75). The medical consultant explained that Ms. Foster's anxiety and panic attacks would affect her ability to

handle complex tasks, but she retains the ability to perform one-, two-, three-, and four-step tasks. (Tr. 75). The medical consultant rated Ms. Foster's ability to interact with the general public as moderately limited based on her anxiety and reports of being "scared easily." (*Id.*). Finally, the medical consultant found Ms. Foster was moderately limited in her ability to respond appropriately to changes in the work setting. (*Id.*). The consultant opined that Ms. Foster's stress tolerance was impaired, but she remained able to work in an environment with infrequent changes that can be explained. (Tr. 76). On reconsideration, the medical consultants adopted the findings from the initial review. (Tr. 80-95).

Thomas M. Evans, Ph.D. conducted a psychological evaluation of Ms. Foster on May 21, 2018. (Tr. 660). Dr. Evans diagnosed Ms. Foster with unspecified depressive disorder, panic disorder, and agoraphobia, noting that his diagnoses were based on Ms. Foster's self-reports. (Tr. 663). Dr. Evans noted that "Ms. Foster was cooperative and friendly in a manner throughout the entire evaluation and rapport was easily established and maintained. There were no noted difficulties with ambulation and gait. She was not observed to be in any physical distress, and sat comfortably in her seat throughout the entire evaluation." (*Id.*). In Dr. Evans's opinion, Ms. Foster would not have difficulties understanding, remembering, or carrying out simple to moderately complex instructions in a workplace setting and could maintain attention, concentration, persistence, and pace to perform simple and multi-step tasks. (Tr. 664).

V. OTHER RELEVANT EVIDENCE

On Ms. Foster's behalf, her friend Donald Graham completed an Adult Function Report in which she described how her conditions limit her activities. She cannot walk, lie down, or stand for significant periods of time before she is in pain. (Tr. 214). Many days, Ms. Foster is unable to

get out of bed. (*Id.*). She uses a cane when feeling unstable, and has a brace. (Tr. 220). She takes baclofen, tramadol, and gabapentin for pain management, Klonopin for anxiety, and Pristiq for depression. (Tr. 221). She endorses a list of side effects, including drowsiness, nausea, agitation, seizures, vomiting, hallucinations, dizziness, double vision, loss of coordination, tremors, fatigue, loss of memory, loss of appetite, dry mouth, constipation, insomnia, and excessive sweating. (*Id.*).

Ms. Foster's typical day starts with taking medications and applying a heating pad until the medications become effective. (Tr. 215). She tries to do a few light household chores but takes breaks when the pain returns. (*Id.*). At mid-day, Ms. Foster takes more medication. (*Id.*). She prepares a ready-made meal or has carry-in when she is unable to cook. (Tr. 215-16). In the evening, she takes more medication and gets ready for bed. (Tr. 221). Ms. Foster's condition took away her motivation to engage in hobbies. (Tr. 218). She talks on the phone with family and friends daily and others come to visit her. (*Id.*). Ms. Foster has agoraphobia and anxiety, so she does not go to any social activities outside the home except occasionally watching her grandchildren's events. (*Id.*).

Ms. Foster's level of pain affects her ability to sleep. (Tr. 215). She wakes up in pain throughout the night, causing daytime drowsiness, for which she takes short naps. (*Id.*). Ms. Foster has difficulty dressing, bathing, and shaving her legs because bending over causes pain. (Tr. 215). Ms. Foster washes her hair less because doing so causes back spasms. (*Id.*).

Ms. Foster needs to be reminded of necessary activities, including medical appointments. (Tr. 216). She sets alerts on her phone to remind her to take her medications. (*Id.*).

Ms. Foster lives with her boyfriend. (Tr. 214). He helps Ms. Foster with household chores. (Tr. 216). Ms. Foster is able to do some light cleaning, dishes, dusting, and sweeping with breaks in

between chores when the pain returns. (*Id.*). She can pay bills, count change, and handle savings and checking accounts. (Tr. 217).

Ms. Foster's conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, maintain concentration, understand, and use her hands. (Tr. 219). Ms. Foster can lift no more than five pounds, walk no more than a quarter of a mile before taking a ten-minute rest, and has difficulty with overhead reaching. (*Id.*). She can pay attention for five to ten minutes at a time, does not finish what she starts, and must reread written instructions. (*Id.*).

Ms. Foster does not go out alone and does not drive because of the medication. (Tr. 217). Ms. Foster's boyfriend accompanies her when she shops. (*Id.*). She rides an electric sit-down cart in the grocery store. (*Id.*). Ms. Foster goes grocery shopping once a week and shops for other necessities once a month. (*Id.*).

Mr. Graham also completed a Third-Party Adult Function Report describing his assessment of how Ms. Foster's conditions limit her activities. (Tr. 266-73). Mr. Graham's responses are similar to the responses in the Adult Function Report he prepared on her behalf.

## THE ALJ'S DECISION

The ALJ's May 24, 2019 decision included the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since March 20, 2018, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: degenerative disc disease ("DDD")/lumbago/post laminectomy syndrome; myalgia; depression/bipolar disorder/mood disorder; anxiety/agoraphobia with panic attacks; cervicalgia; and chronic pain syndrome (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except: Postural limitation of no climbing ladders, ropes, or scaffolds. Occasional climbing of ramps and stairs. Occasional stooping, kneeling, crouching and crawling. Occasional use of the bilateral lower extremities for operation of foot controls. Manipulative limitation of occasional use of the bilateral upper extremities for overhead reaching. Frequent use of the bilateral upper extremities for other reaching, handling, and fingering. Environmental limitation to avoid all exposure to hazards, such as dangerous moving machinery and unprotected heights. Additional environmental limitation to avoid concentrated exposure to irritants such as fumes, odors, dust, gases, extreme cold, extreme heat, and humidity. Work limited to simple, routine, and repetitive tasks in a work environment free from fast paced production requirements, such as moving assembly lines and conveyor belts, involving only work related decisions, with few if any work place changes. Occasional interaction with the general public, coworkers, and supervisors.

5.    The claimant has no past relevant work (20 CFR 416.965).

6.    The claimant was born on June 10, 1968 and was 49 years old, which is defined as a younger individual age 18-49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 416.963).

7.    The claimant has a limited education and is able to communicate in English. (20 CFR 416.964).

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969a).

10.   The claimant has not been under a disability, as defined in the Social Security Act, from March 20, 2018, the date the application was filed (20 CFR 416.920(g)).

(Tr. 19-27).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of

14

evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

15

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

## I. The ALJ properly considered statements about the intensity, persistence, and limiting effects of Ms. Foster's symptoms.

Ms. Foster asserts the ALJ did not properly consider Ms. Foster's complaints of disabling symptoms. (Pl.'s Br., ECF #14, PageID 1196). Ms. Foster acknowledges the ALJ found her statements about the intensity, persistence, and limiting effects not entirely consistent with the record, but claims the ALJ failed to "properly consider [Ms.] Foster's disabling pain and the fact that the combination of her pain and psychological impairments would likely result in an inability to sustain and/or maintain attention and concentration." (*Id.* at PageID 1197-98). She further contends the ALJ erred by not addressing Mr. Graham's Third-Party Adult Function Report. (*Id.* at PageID 1198).

The Commissioner responds that the ALJ appropriately considered statements about the intensity, persistence, and limiting effects of Ms. Foster's symptoms and found them inconsistent with the objective medical evidence, Ms. Foster's repeated admissions to decreased pain and

16

improved function with medication, and Ms. Foster's documented activities. (Comm'r's Br., ECF #16, PageID 1221-23). Moreover, while conceding the ALJ did not articulate a rationale for discounting Mr. Graham's Function Report, the Commissioner argues this is harmless error because Mr. Graham's responses "essentially replicate [Ms. Foster's] own subjective statements." (*Id.* at PageID 1223-24).

An ALJ follows a two-step process for evaluating an individual's symptoms. In step one, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. In step two, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second stage, the ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources. *Id.*

The ALJ is not required to accept the claimant's subjective complaints, and may discount the claimant's subjective testimony when the ALJ deems it inconsistent with objective medical and other evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003). The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. The ALJ need not use any "magic words," as long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021). The ALJ's assessment of an individual's statements about her symptoms is entitled to "great weight and deference." *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531

(6th Cir. 1997); *see also Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442 (6th Cir. 2017)

(stating that an ALJ's credibility findings "are virtually unchallengeable absent compelling

reasons") (internal quotation omitted).

     Here, the ALJ compared Ms. Foster's statements about the disabling nature of her

symptoms (Tr. 23) with the objective medical evidence that was largely normal (Tr. 23-24), Ms.

Foster's own reports to medical providers about symptom improvement (Tr. 25), and the medical

source opinions from a consultative examiner and state agency consultants. (Tr. 25-26). The ALJ

concluded Ms. Foster's statements concerning the intensity, persistence, and limiting effects of the

symptoms were not entirely consistent with the medical evidence and other evidence of record.

(Tr. 26). The ALJ further explained Ms. Foster's complaints of disabling symptoms and limitations

did not comport with her daily activities, including a two-week stay with her daughter and seven

grandchildren. (Tr. 26). The ALJ noted Ms. Foster told a medical provider in January 2018 she was

feeling great after the visit and that it takes a lot of energy to be around seven grandchildren all the

time. (Tr. 26, 1050). This, the ALJ concluded, "tends to suggest that the alleged symptoms and

limitations may have been overstated." (Tr. 26).

     In addition, the ALJ noted Ms. Foster was not entirely compliant with her medications.

(Tr. 26). Indeed, Ms. Foster's medical records show she did not renew prescriptions for weeks after

running out and never took other prescribed medications, which, the ALJ explained, "suggests that

her symptoms may not be as limiting as [Ms. Foster] has alleged in connection with this

application." (Tr. 26).

     As to Mr. Graham's Third-Party Function Report, I agree with the Commissioner that the

ALJ's failure to address the report is harmless error. Comparing Ms. Foster's Function Report with

18

Mr. Graham's Third-Party Function Report show Mr. Graham reiterates Ms. Foster's statements. The ALJ properly discounted Ms. Foster's statements about the limiting effects of her impairments and his basis for doing so is equally applicable to Mr. Graham's nearly-identical statements. *See King v. Berryhill*, No. 3:17-cv-125, 2018 WL 6438969, at *8 (E.D. Tenn. Dec. 7, 2018) (finding no reversible error where the ALJ did not specifically address lay witness testimony that was duplicative of claimant's testimony).

I thus find no basis to conclude the ALJ erred in considering the intensity, persistence, and limiting effects of Ms. Foster's symptoms.

## II. Although the ALJ erred by not discussing Ms. Foster's use of a cane for ambulation, that error harmless; thus, the ALJ's assessment of Ms. Foster's RFC is supported by substantial evidence.

Ms. Foster next asserts the ALJ erred in determining her RFC by not considering the totality of Ms. Foster's severe impairments. (Pl.'s Br., ECF #14, PageID 1189). She contends the ALJ improperly relied on Ms. Foster's ability to perform some activities to conclude Ms. Foster is not disabled; failed to address the entire record, namely, Ms. Foster's multiple back surgeries and continuing problems, complaints of weakness, and memory lapses; and did not address Dr. Sprout's medical opinion in accordance with the regulations. (*Id.* at PageID 1193-95). Ms. Foster also takes issue with the ALJ not including her need for a cane in the RFC. (*Id.* at PageID 1201). Ms. Foster claims the record clearly establishes her need, at times, for an assistive device, and that it was reversible error to not include the information in the RFC. (*Id.*).

The Commissioner responds the ALJ properly determined Ms. Foster's RFC by considering the largely unremarkable objective medical evidence and the opinions of the examining consultant and state agency medical consultants. (Comm'r's Br., ECF #16, PageID

1217). As to Dr. Sprout's medical opinion, the Commissioner notes Ms. Foster submitted the additional documentation with her request for review to the Appeals Council, which was not before the ALJ at the time of his decision and, therefore, cannot be considered in determining whether substantial evidence supports the ALJ's decision. (*Id.* at PageID 1227). As to the need for an assistive device, the Commissioner responds that Ms. Foster failed to produce the required medical documentation outlining the circumstances in which a cane was medically necessary. (*Id.* at PageID 1219).

The ALJ alone is responsible to form an RFC appropriate to the claimant's abilities, supported by the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). The RFC is to be an assessment of the claimant's remaining capacity for work once the claimant's limitations have been considered. *Id.* at 632. An ALJ is to consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020).

The ALJ also must determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* An ALJ "is only required to incorporate those limitations which he has deemed credible" and may reject limitations or impose more restrictions. *Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010). Doing so does not mean an RFC is not supported by substantial evidence. *Ross v. Comm'r of Soc. Sec.*, No. 14-11144, 2015 WL 1245830, at *11 (E.D. Mich. Mar. 18, 2015).

20

Here, as noted above, the ALJ considered the evidence before her, including the surgical records, the physical and neurological examinations, Ms. Foster's complaints to her medical providers, the type, efficacy, and compliance with treatments, Ms. Foster's statements about her symptoms, and reports from examining and reviewing consultants to craft Ms. Foster's RFC.

Ms. Foster contends the ALJ failed to address Ms. Foster's multiple back surgeries with continuing problems and her complaints of pain, weakness, and memory lapses. Contrary to Ms. Foster's contention, the ALJ did address these issues, ultimately determined Ms. Foster's complaints were not supported by the evidence of the record. For instance, the ALJ noted Ms. Foster complained of poor memory, but admitted to weeks of psychiatric medication noncompliance. (Tr. 24). The ALJ also considered Ms. Foster's complaints of pain and weakness, including a January 2018 treatment note where Ms. Foster stated she was "feeling great" after spending two weeks with her daughter and seven grandchildren. (Tr. 24). In addition, the ALJ considered the consultative examination in which Dr. Evans observed no difficulties with ambulation and gait, noted Ms. Foster sat in her seat comfortably throughout the evaluation, and stated Ms. Foster did not appear to have difficulties with maintaining focus or understanding, remembering, and carrying out simple to moderately complex instructions in a workplace setting. (Tr. 25).

On review of the entire record, I find the ALJ considered the totality of the evidence and crafted an RFC reflecting Ms. Foster's credible restrictions. Moreover, I conclude the ALJ did not commit harmful error by failing to review Dr. Sprout's medical source opinion. The documentation was not before the ALJ; it was submitted with Ms. Foster's request for review to the Appeals Council. (Tr. 1-6). Evidence submitted for the first time to the Appeals Council

21

cannot be considered for purposes of determining whether substantial evidence supports the ALJ's decision but may only be considered to determine whether remand is appropriate under Sentence Six of 42 U.S.C. § 405(g). *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Ms. Foster has not argued for remand under Sentence Six, and by not raising it in her opening brief she has waived the issue. *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003).

In her last RFC-related argument, Ms. Foster argues the ALJ erred by not incorporating her necessity to use a cane in the RFC. According to SSR 96-9p, to find a hand-held assistive device medically necessary, there must be medical documentation establishing the need for a hand-held assistive device and describing the circumstances for which it is required.

Ms. Foster's initial brief avers that the record clearly established a need for "an assistive device at times related to her post laminectomy syndrome related to her multiple back surgeries," although it does not provide any support from the medical record,  (Pl.'s Br., ECF #14, PageID 1201). In her reply brief, Ms. Foster points to a single record, an initial evaluation for occupational therapy from October 2016, in which occupational therapist stated, "Patient requires the use of a single point cane when in pain and is restricted to walking one block due to pain in her low back and bilateral lower extremities." (Tr. 967). Ms. Foster claims this note satisfies her requirement to prove medical necessity. (Pl.'s Reply Br., ECF #17, PageID 1232). The initial evaluation also notes Ms. Foster told the occupational therapist she has a single point cane that she uses for mobility when in pain. (Tr. 972).

"To be considered a restriction or limitation, a cane 'must be so necessary that it would trigger an obligation on the part of the Agency to conclude that the cane is medically necessary,' i.e., the record must reflect more than just a subjective desire on the part of the plaintiff as to the

use of the cane." *Austin v. Comm'r of Soc. Sec.,* 1:19-cv-2380, 2020 WL 9460505, quoting *Murphy v. Astrue,* 2:11-cv-00114, 2013 WL 829316 at *10 (M.D. Tenn. Mar. 6, 2013), *report and recommendation adopted,* 2013 WL 4501416 (M.D. Tenn. Aug. 22, 2013). Indeed, there is an argument that the medical documentation Ms. Foster points to for proof that her use of a cane is medically necessary does not establish medical necessity but rather merely acknowledges that Ms. Foster, of her own accord, decided to use a cane for ambulation. Additionally, the medical record reveals Ms. Foster consistently had a normal gait and normal extremity strength.

I agree with the Commissioner that Ms. Foster's subjective belief that she needs a cane is not sufficient proof that an assistive device merits inclusion in the RFC. *See Morrow v. Comm'r of Soc. Sec.,* No. 1:18-cv-0403, 2019 WL 1428199, at *11 (N.D. Ohio Mar. 29, 2019). But despite this potentially supportive evidence, the ALJ's decision does not explain why he omitted a cane from Ms. Foster's RFC, and this Court is not permitted to speculate on the basis of the ALJ's decision or render independent findings. *Streckroth v. Comm'r of Soc. Sec.,* No. 11-10473, 2012 WL 1079544 (E.D. Mich. Mar. 30, 2012), quoting *Hyatt Corp v. NLRB,* 939 F.2d 361, 367 (6th Cir. 1991). Because the ALJ did not build an accurate and logical bridge between the evidence and the result, this Court cannot determine if the evidence regarding Ms. Foster's cane was discounted or merely overlooked. I thus conclude the ALJ erred by not explaining his omission of Ms. Foster's cane from the RFC.

However, such an error is harmless when the claimant cannot show that the ultimate determination of the existence of available jobs in the national economy would have been different had such a limitation been included. *See Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 546-47 (6th Cir. 2004) (noting that an ALJ's error "will not result in reversible error absent a showing that the

23

claimant has been prejudiced on the merits *or deprived of substantial rights because of the [ALJ's] procedural lapses*") (emphasis in original).

Here, Ms. Foster's counsel asked the VE if an individual would be able to perform the identified positions (hand packager, mail sorter, and laundry folder) with use of a cane. (Tr. 59). The VE responded a person could probably perform those jobs if the cane were for ambulation; if an individual needed a cane to stand, the limitation would preclude such light jobs. (Tr. 59). Ms. Foster alleged she needs a cane for ambulation, not for standing. Based on the VE testimony, even if the ALJ had included a cane for ambulation in the RFC, Ms. Foster would still be able to perform work as a hand packager, mail sorter, and laundry folder. Therefore, although the ALJ erred in not explaining why he did not include a cane in Ms. Foster's RFC, the error was harmless and does not require remand.

For all of these reasons, I find no error in the ALJ's analysis of Ms. Foster's RFC sufficient to warrant remand.

## III. The ALJ erred by failing to confirm the VE's testimony was consistent with the Dictionary of Occupational Titles, but the error was harmless.

Finally, Ms. Foster asserts the ALJ's failure to ask the VE if his testimony conflicted with the Dictionary of Occupational Titles violated the Hearings, Appeals, and Litigation Law Manual ("HALLEX") I-2-6-74 and SSR 00-4p is an error requiring remand. (Pl.'s Br., ECF #14, PageID 1200). Additionally, Ms. Foster contends the ALJ's failure to schedule a supplemental hearing to address Ms. Foster's "additional vocational evidence," submitted post-hearing, or rule on Ms. Foster's post-hearing objection to the VE's testimony are errors requiring remand. (*Id.* at PageID 1200-01).

The Commissioner concedes the ALJ did not ask the VE if his testimony was consistent with the DOT, but maintains reversal is not required because Ms. Foster fails to identify any conflicts between the VE's testimony and the DOT. (Comm'r's Br., ECF #16, PageID 1225). Moreover, the Commissioner notes Ms. Foster did not object to the VE's testimony at the hearing and argues the ALJ was under no obligation to rule on Ms. Foster's post-hearing objection. (*Id.* at PageID 1226-27).

A VE's testimony may provide substantial evidence that an individual has the vocational qualifications to perform specific jobs, but only if the hypothetical question as posed accurately portrays the individual's physical and mental impairments. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). Both HALLEX and SSR 00-4p instruct that before an ALJ may rely on evidence from a VE to support a disability determination, the ALJ must inquire on the record whether there are any conflicts between occupational evidence the VE provided and information contained in the DOT. When there is an apparent unresolved conflict between the VE's evidence and the DOT, the ALJ must elicit a reasonable explanation for the conflict before relying on the VE evidence to support a disability determination. SSR 00-4p.

Here, it is undisputed that, at the hearing, the ALJ did not ask whether the VE's testimony was consistent with the DOT, and if not, whether there was any reasonable explanation for the conflict. This is procedural error.

Ms. Foster argues this failure requires remand "to determine if the vocational testimony was consistent with the DOT and whether [Ms.] Foster can perform any work which exists in the national economy." (Pl.'s Br., ECF #14, PageID 1200). This argument is unavailing. At the hearing, Ms. Foster did not object to the VE's testimony or identify any inconsistency, and she

does not do so in her brief to this Court. Courts within the Sixth Circuit hold that an ALJ's failure to inquire about consistency with the DOT may constitute harmless error where there is no conflict between the VE's testimony and the DOT. *See Joyce v. Comm'r of Soc. Sec.*, 662 Fed. App'x 430, 436 (6th Cir. 2016) ("[A]n ALJ's failure to inquire about a nonexistent conflict is necessarily harmless"); *see also Smith v. Berryhill*, 2017 WL 1196519, at \*11 (M.D. Tenn. Mar. 31, 2017) ("However, the ALJ's failure to make such an inquiry was harmless as Plaintiff fails to show an actual conflict between the VE's testimony and the DOT's job descriptions"); *Bennett v. Comm'r of Soc. Sec.*, 2016 WL 7395795, at \*6 (N.D. Ohio Dec. 2, 2016) ("[U]nless the VE's testimony actually conflicts with the DOT, such error is harmless."), *report and recommendation adopted*, 2016 WL 7396707 (N.D. Ohio Dec. 21, 2016).

Ms. Foster maintains that she presented "additional vocational evidence" with objection to the VE testimony after the administrative hearing. She argues the ALJ failed to mention the objection or set the matter for a supplemental hearing and these failures constitute harmful, reversible error. (Pl.'s Br., ECF #14, PageID 1201). Furthermore, Ms. Foster claims she is entitled to a supplemental hearing because "testimony was adverse to the claimant's interest, presented evidence that the claimant could not reasonably have anticipated, and to which the claimant was not prepared to respond." (Pl.'s Br., ECF #14, PageID 1227).

An ALJ is not required to address post-hearing objections. *See Zimmerman v. Comm'r of Soc. Sec.*, No. 1:18-cv-1233, 2019 WL 4736267, at \*8-9 (N.D. Ohio Sept. 27, 2019) ("The failure to object to evidence, or failure to cross-examine a VE about the topic at the hearing, precludes the claimant from later raising the issue") (collecting cases); *see also Komorowski v. Comm'r of Soc. Sec.*, No. 1:19-cv-1327, 2020 WL 4390523 at \*2 (N.D. Ohio July 31, 2020) ("ALJ has no obligation to

26

rule on objections made after the conclusion of the hearing."). Courts in the Sixth Circuit have also recognized that "ALJs have no duty to convene a second hearing to question a VE that the plaintiff could have raised initially." *See, e.g., Roberts v. Comm'r of Soc. Sec.*, No. 2:18-cv-00541, 2019 WL 4023549, at *7 (S.D. Ohio Aug. 26, 2019); *Keehl v. Comm'r of Soc. Sec.*, No. 1:18-cv-281, 2019 WL 3980714 (W.D. Mich. Sept. 12. 2018). Ms. Foster has, therefore, not identified an error requiring remand.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision.

Dated: December 10, 2021

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).**